UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X

THE NEW YORK TIMES COMPANY and
CHARLIE SAVAGE,

                              Plaintiffs,

                  -v-

NATIONAL SECURITY AGENCY,

                            Defendant.

---------------------------------------------------------------- X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: <u>August 25, 2016</u>

15-cv-2383 (KBF)

<u>OPINION & ORDER</u>

KATHERINE B. FORREST, District Judge:

        In this action, the newspaper the New York Times and one of its reporters, Charlie Savage (collectively, the "New York Times" or "Times") challenge three redactions to two documents produced by the National Security Agency (the "NSA" or "Agency") in response to a Freedom of Information Act ("FOIA") request. The parties have cross-moved for summary judgment as to the propriety of these redactions. (ECF Nos. 15 & 19.) For the reasons stated below, the NSA's motion is GRANTED and the New York Times' motion is DENIED.

I.      FACTUAL BACKGROUND

      A.    <u>Procedural History</u>

        On January 12, 2015, the New York Times submitted a FOIA request to the NSA pursuant to 5 U.S.C. § 552. (ECF No. 1 ¶¶ 1, 8.) The Times sought "copies of – and declassification review of, as necessary – all NSA Inspector General Reports related to" three topics: "the agency's content collection activities under the FISA

Amendments Act section 702 and the predecessor law, the Protect America Act;" "bulk phone records collection activities under Section 215 of the Patriot Act (the 'FISA Business Records' program);" and "bulk Internet metadata collected under the FISA pen register/trap and trace provision (the 'FISA PR/TT program)." (Id. ¶ 9; ECF No. 21 Exh. A.)  The NSA did not provide a substantive response within 20 days as required by FOIA, and on March 31, 2015, the Times filed this action.

After the Agency answered the complaint (ECF No. 8), the parties jointly agreed to a schedule under which the NSA would process and release all non-exempt responsive documents in three batches, on August 11, 2015, November 10, 2015, and February 10, 2016.  (ECF No. 10.)  The NSA engaged in an extensive declassification process and released hundreds of pages of material, many of which contained redactions.  (ECF No. 20 at 2; ECF No. 13.)  Following the three releases, the New York Times challenged certain redactions, some of which the NSA agreed were appropriate for publication in a supplemental release.  (ECF No. 13.)  The Times and other media outlets have discerned important insights and published numerous stories from the full roster of released documents.  (ECF No. 20 at 3 & nn. 3 & 4.)

B.   <u>The Reports at Issue</u>

The remaining conflict between the Times and the Agency concerns three redactions in two NSA Inspector General Reports.  The first report is five pages long and titled "Report on the Special Study of NSA's Purge of Pen Register and Trap and Trace Bulk Metadata" (the "PR/TT Report").  (ECF No. 21 Exh. B.)  The

2

"Overview" section of the Report explains that it summarizes the Office of the NSA Inspector General's "special study of the Agency's processes to destroy Pen Register and Trap and Trace (PR/TT) bulk metadata from its declared systems, databases, and backups before the authority expired on 9 December 2011."[1]  (Id. at 1.)

The redaction the New York Times challenges is found on the first and second pages of the Report, in a section titled "Background."  This section explains that between July 2004 and December 2011 the NSA, "with the assistance of certain U.S. telecommunications service providers, collected, processed, and analyzed metadata from Internet communications to obtain foreign intelligence information." (Id.)  It further states that "[i]n early 2011, the Signals Intelligence Directorate (SID) conducted an examination of the NSA PR/TT program to assess its value," which "revealed that the PR/TT program was not producing valuable foreign intelligence information after the program had been reinitiated."  (Id.)  The Signals Intelligence Directorate then requested that the Director of the NSA terminate the PR/TT program and "identified several limitations that contributed to the program's inability to meet expectations."  (Id.)  A list of four such limitations follows.  One, the fact that "[o]ther authorities can satisfy certain foreign intelligence requirements that the PR/TT program was designed to meet," is not redacted; the other three are redacted in their entirety.  (Id. at 1-2.)

---

[1] The Sherman declaration, discussed further below, provides further background information about the PR/TT program, through which the government acquired metadata, such as the "to" and "from" lines in an email and the date and time it was sent, but not its contents.  (ECF No. 17 ¶ 19.)

The second report relevant to the instant motion is forty-six pages long and titled "Report on the Special Study: Assessment of Management Controls Over FAA §702" (the "§ 702 Controls Report").  (ECF No. 21 Exh. C.)  A cover sheet explains that the Report summarizes the Office of the NSA Inspector General's "special study of management controls that ensure compliance with Section 702 of the Foreign Intelligence Surveillance Act (FISA) Amendments Act of 2008 (FAA §702) and the Targeting and Minimization Procedures associated with the 2011 Certifications."[2]  (Id.)

The first redaction the New York Times challenges in the § 702 Controls Report is on the first page, in the section titled "Background."  (Id. at 1.)  Under the subheading "Requirements of FAA §702," the Report states that "[t]he target of collection must be a non-U.S. person (USP) who is reasonably believed to be located outside the United States and possesses, is expected to receive, and/or is likely to communicate foreign intelligence".  (Id.)  The next several words are redacted and followed by the words "FAA § 702 Certifications:"  (Id.)  The paragraph beginning on the next line is redacted in its entirety; it is this redaction the Times challenges.

The second redaction at issue in the § 702 Controls Report comes on the twentieth page, in the section titled "FINDINGS AND RECOMMENDATIONS."

---

[2] The Sherman declaration, discussed further below, provides further background information about the NSA's activities pursuant to § 702, which is codified at 50 U.S.C. § 1881a.  (ECF No. 17 ¶¶ 31-36.)  Section 702 authorizes the Attorney General and the Director of National Intelligence to jointly authorize the targeting of non-United States persons reasonably believed to be outside the United States for foreign intelligence information.  Each instance of this targeting requires that the Foreign Intelligence Surveillance Court first approve of an annual certification and affidavit filed by the Attorney General and the Director of National Intelligence which sets forth how the targeting will comply with limiting and minimization requirements.  See 50 U.S.C. § 1881a(g).

(<u>Id.</u> at 13.)  This section encompasses six separate findings and eleven related recommendations.  (<u>Id.</u> at 13-37.)  Although five of the findings and ten of the recommendations are at least partially disclosed, the second finding and associated third recommendation are in effect entirely redacted.  (<u>Id.</u> at 19-20.)  Only a portion of the title of the finding, "Certain FAA §702 Selectors," one subheading stating "Verification that Authorized Selectors Are on Collection," and a reference to the title, but not content, of a 2008 Office of the Inspector General report are not redacted from the finding.  (<u>Id.</u> at 19.)  Within the recommendation, with one exception, only headings such as "ACTION" and "Management Response," but not the content following, is not redacted.  (<u>Id.</u> at 20.)  The exception is the final comment from the Inspector General, which reads "Planned action satisfies the intent of the recommendation."  (<u>Id.</u>)  The Times challenges the redaction of the recommendation.

 C. <u>The Sherman Declaration</u>

 In support of its motion for summary judgment, the NSA submitted a declaration from David J. Sherman, the Agency's Associated Director for Policy and Records and the official responsible for processing FOIA requests for NSA records. (ECF No. 17 ¶ 1.)  Sherman is "a TOP SECRET original classification authority ('OCA') pursuant to Section 1.3 of Executive Order ('E.O.') 13526."  (<u>Id.</u> ¶ 2.)  He was responsible for asserting FOIA exemptions on the materials disclosed in this case. (<u>Id.</u>)

Sherman's declaration sets out the NSA's reasoning for the challenged redactions.[3]  According to the declaration, the redacted information falls within three of the categories of information which can be properly classified under E.O. 13526: § 1.4(c), which covers "intelligence activities (including covert action), intelligence sources or methods, or cryptology;" § 1.4(d), which covers "foreign relations or foreign activities of the United States, including confidential sources;" and § 1.4(g), which covers "vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to the national security."  (Id. ¶ 11.)  Sherman further declared that the information was not classified for an improper purpose, such as concealing violations of law or preventing embarrassment, and that the withheld information is more specific than any previously released information on the same topics.  (Id. ¶¶ 13-14.)  In a separate section, Sherman attests that no portion of the challenged redactions could have been reasonably segregated and publicized; while some information viewed in isolation could be considered unclassified, if disclosed in the contexts of these reports even these seemingly mundane portions could reveal classified information. (Id. ¶¶ 44-45.)

The declaration then addresses the specific redactions at issue in this litigation.  As to the PR/TT Report, Sherman explains that while one of the four

---

[3] The NSA argues that each of the challenged redactions are covered by both FOIA Exemption 1, 5 U.S.C. § 552(b)(1), and FOIA Exemption 3, id. § 552(b)(3).  (ECF Nos. 16 & 17.)  As discussed below, the Court finds that the NSA acted properly pursuant to Exemption 1.  Because "courts may uphold agency action under one exemption without considering the applicability of the other," the Court limits its discussion to the facts relevant to Exemption 1.  Wilner v. NSA, 592 F.3d 60, 72 (2d Cir. 2009) (quoting Larson v. Dep't of State, 565 F.3d 857, 862-63 (D.C. Cir. 2009)).

operational limitations identified by the Signals Intelligence Directorate had been previously disclosed and was thus not redacted, the remaining three were currently and properly classified at the Top Secret level, meaning their release could reasonably be expected to cause exceptionally grave damage to the national security.  (Id. ¶¶ 20-21.)

According to Sherman, disclosure of these limitations would reveal the capabilities and limitations of the PR/TT program, thereby providing the country's adversaries with insight into both the likelihood that prior communications were collected and the efficacy of particular countermeasures to protect current communications.  (Id. ¶ 22.)  The limitations also include operational details, such as technical means and analytic tools and methodologies, which have not been disclosed and which could alert adversaries to the government's awareness of specific countermeasures and tradecraft.  (Id. ¶¶ 23-24.)  Although the PR/TT program has been discontinued, Sherman's declaration explains, the NSA still collects certain electronic metadata pursuant to other authorities, and revealing the success or lack thereof of the PR/TT program would thus risk exposing ongoing efforts.  (Id. ¶ 25.)  Finally, information about the NSA's technological capabilities might assist other countries' efforts to develop their own metadata collection program to target the United States.  (Id. ¶ 26.)

As to the § 702 Controls Report, the declaration first states that the redacted information on page one "pertains to the number and categories of certifications made pursuant to Section 702 of the FAA."  (Id. ¶ 31.)  Sherman attests that this

7

information is currently and properly classified at the Secret / No Foreign Nationals level, meaning its release could reasonably be expected to cause serious damage to the national security.  (Id. ¶ 37.)  According to the declaration, disclosure of the number and categories of certifications would reveal the NSA's ability to collect intelligence or lack thereof and thereby provide adversaries with insight into whether § 702 targeting had been potentially applied to their communications and how they could tailor their communications to escape such targeting.  (Id. ¶¶ 38-39.)

As to the redacted recommendation information on page twenty of the § 702 Controls Report, Sherman attests that "[t]his information consists of technical aspects and procedures of NSA's collections under Section 702 of the FAA," and is currently and properly classified Top Secret.  (Id. ¶ 42.)  The declaration explains that the redacted information contains "granular detail" which, if revealed, would indicate important information about "the sophistication of NSA's SIGINT system" and aid efforts to implement countermeasures.  (Id.)

## II.   LEGAL PRINCIPLES

### A.   Summary Judgment Standard

Summary judgment is warranted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  FOIA litigation is typically resolved on summary judgment.  Carney v. Dep't of Justice, 19 F.3d 807, 812-13 (2d Cir. 1994).  When an agency withholds material under a FOIA exemption, "[t]he agency asserting the exemption bears the burden of proof, and all doubts as to the applicability of the exemption must be

resolved in favor of disclosure." New York Times Co. v. Dep't of Justice, 756 F.3d

100, 112 (2d Cir. 2014) (quoting Wilner v. Nat'l Sec. Agency, 592 F.3d 60, 69 (2d Cir.

2009)).  This burden can be met through the submission of "affidavits or

declarations giving reasonably detailed explanations why any withheld documents

fall within an exemption." Id. (alteration omitted) (quoting ACLU v. Dep't of

Justice, 681 F.3d 61, 69 (2d Cir. 2012)).  Such declarations are "accorded a

presumption of good faith." Carney, 19 F.3d at 812.  If the affidavits describe the

justification for nondisclosure logically and in sufficient detail "and are not

controverted by either contrary evidence in the record nor by evidence of agency bad

faith," summary judgment for the agency is appropriate.  Larson v. Dep't of State,

565 F.3d 857, 862 (D.C. Cir. 2009) (quoting Miller v. Casey, 730 F.2d 772, 776 (D.C.

Cir. 1984)).  If one exemption is upheld, the Court need not consider the

applicability of another.  Wilner, 592 F.3d at 72.

    B.    FOIA Exemption 1

      The FOIA statute operates generally as a requirement that agencies disclose

information upon request.  See 5. U.S.C. § 552(a) ("Each agency shall make

available to the public information as follows:"); id. § 552(a)(3)(A).  The same statute

also lists a number of categories of materials to which "[t]his section does not

apply." Id. § 552(b).  The first exemption, and the one relevant to the instant

matter,[4] carves out matters that are "(A) specifically authorized under criteria

established by an Executive order to be kept secret in the interest of national

---

[4] See supra note 3.

defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." Id. § 552(b)(1).

The current standard for classification is set forth in Executive Order 13526, 75 Fed. Reg. 707 (Dec. 29, 2009). Section 1.1 of that order lists four requirements for the classification of national security information: (1) "an original classification authority" must classify the information; (2) the information must be "owned by, produced by or for, or … under the control of the United States Government;" (3) the information must "fall[] within one or more of [eight] categories of information" listed elsewhere in the order; and (4) the original classification authority must "determine[] that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security," which damage the authority can identify and describe. "Original classification authorities" include government officials delegated this authority in accordance with procedures and limitations set forth in E.O. 13526. Id. § 1.3(a)(3). The eight relevant categories of information include, as relevant to this case, information that pertains to "intelligence activities (including covert action), intelligence sources or methods, or cryptology;" "foreign relations or foreign activities of the United States, including confidential sources;" or "vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to the national security." Id. § 1.4. Information can never be properly classified "in order to: (1) conceal violations of law, inefficiency, or administrative error; (2) prevent embarrassment to a person, organization, or agency; (3) restrain competition; or (4)

prevent or delay the release of information that does not require protection in the interest of the national security." Id. § 1.7.

Even where a FOIA exemption applies, the withholding must be narrow, such that "[a]ny reasonably segregable portion of a record shall be provided ... after deletion of the portions which are exempt." 5 U.S.C. § 552(b). This provision does not require disclosure of non-exempt material rendered meaningless by surrounding deletions, see Cook v. Nat'l Archives & Records Admin., 758 F.3d 168, 178 (2d Cir. 2014), nor does it require disclosure of facially mundane material that is classified because it could, in context, reveal national security information and pose a harm. See Wilner v. Nat'l Sec. Agency, 592 F.3d 60, 73 (2d Cir. 2009).

FOIA Exemption 1 is, like the other exemptions, to be construed narrowly. Dep't of Air Force v. Rose, 425 U.S. 352, 366 (1976); New York Times Co. v. Dep't of Justice, 756 F.3d 100, 111-12 (2d Cir. 2014). At the same time, however, courts must pay careful attention to "the relative competencies of the executive and judiciary" in the arena of national security. Wilner, 592 F.3d at 76. Courts do so by giving not only a presumption of good faith but in fact "substantial weight" to agencies' affidavits regarding national security. ACLU v. Dep't of Justice, 681 F.3d 61, 69 (2d Cir. 2012). Thus, rather than undertaking a detailed, searching review of an agency's opinions regarding the harm to the country posed by disclosure of withheld information, courts should instead ask whether the government's arguments for nondisclosure are plausible and logical and, if so, uphold the

11

application of the exemption.  ACLU v. Dep't of Def., 628 F.3d 612, 624 (D.C. Cir.

2011); Halperin v. CIA, 629 F.2d 144, 148 (D.C. Cir. 1980).

III.    ANALYSIS

As discussed above, the New York Times challenges three separate

redactions in the two Inspector General reports at issue.  The Court addresses each

of the redactions independently and then addresses the Times' argument that the

Court should conduct in camera review of the reports prior to rendering a decision.

A.    The Redaction in the PR/TT Report

Associate Director Sherman provided a detailed explanation for the

challenged redaction of three operational limitations in the PR/TT Report.  He

specifically affirmed that the information is currently and properly classified Top

Secret, and explained that the withheld portion of the report includes details about

the National Security Agency's capabilities and limitations which, if revealed, would

tend to inform adversaries about both the likelihood that specific communications

were captured in the past and the efficacy of certain countermeasures.  Sherman's

declaration also states that the withheld information includes operational details

about the technical means and analytic methods by which the NSA collected

metadata, and that revealing these details would, among other things, both reveal

the government's knowledge of specific tradecraft practiced by adversaries and

assist adversaries' efforts to develop their own metadata collections programs

targeting the United States.

The Sherman declaration thus contains a detailed, logical, and plausible explanation for why the challenged redaction in the PR/TT Report fits within FOIA Exemption 1.  Although the Times advances several arguments regarding the strength of this explanation, none succeed in portraying it as illogical or implausible.

First, the Times points out that the PR/TT program that is at issue in the report was discontinued nearly five years ago; indeed, the focus of the Report is the Agency's purge of recorded bulk metadata following the expiration of the relevant authority.  However, the fact that the specific program at issue is no longer operational does not answer the question of whether the redacted information is properly classified.  The Sherman declaration specifically notes that the NSA remains authorized to acquire certain other metadata pursuant to different programs.  It is certainly logical to limit information about the capabilities and vulnerabilities of a discontinued program where doing so could reveal the capabilities and vulnerabilities of ongoing programs.  See Amnesty Int'l USA v. CIA, 728 F. Supp. 2d 479, 507-08 (S.D.N.Y. 2010) (upholding FOIA Exemption 1 redaction of information about discontinued practices).

The Times also argues that the NSA's disclosures to date on topics similar to the withheld limitations cut against the claims of harm in the Sherman declaration. It points out that the undisclosed portions of the PR/TT Report indicate that the program was not meeting expectations and that the Agency could meet certain of the goals of the PR/TT program through alternative means.  These points do not,

however, undercut the explanation the Agency has offered.  The Sherman

declaration does not describe the harms that would follow from any disclosure of the

Agency's bulk metadata program, but instead focuses on the specific operational

and historical details contained in the three redacted limitations.  The entire

statutory structure of FOIA and its exemptions anticipates a line-drawing exercise

and the disclosures to date are not of the kind that would suggest no identifiable

harm could come from further disclosure.  See, e.g., Students Against Genocide v.

Dep't of State, 257 F.3d 828, 835 (D.C. Cir. 2001).

The final point of discrete dispute as to the redactions in the PR/TT Report

relates to the level of generality of the redacted limitations, which can be

imperfectly inferred by reference to the non-redacted third limitation.   The New

York Times argues that this limitation is at a sufficiently high level of generality to

suggest that disclosure of the other limitations would not convey actionable

information.  The NSA disputes the characterization.  The passage reads, in its

entirety:

> 3.  Other authorities can satisfy certain foreign intelligence
> requirements that the PR/TT program was designed to meet.  The
> Supplemental Procedures Governing Communications Metadata
> Analysis (SPCMA), which SID implemented widely in late 2010, allows
> NSA to call-chain from, to, or through U.S. person selectors in Signals
> Intelligence collection obtained under a number of authorities.  In
> addition, notwithstanding restrictions stemming from the FISC's
> recent concerns regarding upstream collection, FAA §702 has emerged
> as another critical source for collection of Internet communications of
> foreign terrorists.  Thus, SPCMA and FAA §702 assist in the
> identification of terrorists communicating with individuals within the
> United States, which addresses one of the original reasons for
> establishing the PR/TT program in 2004.

14

Taking this non-redacted passage as imperfectly representative of the level of detail contained in the redacted passage, they are not so general that the harm anticipated in the Sherman declaration becomes illogical or implausible.  The disclosed passage describes how certain NSA programs developed over time to capture particular forms of information and meet particular goals.  Although these are not highly technical details, they are certainly at a level that provides insight and clarification about NSA practices and capabilities, precisely the kind of damage Sherman invokes in his explanation that the redacted limitations are properly classified at the Top Secret level.  The Court thus does not agree that the redacted information is only a high-level summary which could not logically harm the country if released.

As a result of the above, the Court concludes that the NSA's explanation for its continued redaction of three operational limitations in the PR/TT Report is logical, plausible, and contains the requisite reasonable detail to carry the Agency's burden of proving the applicability of FOIA Exemption 1.

B.     The First Redaction in the § 702 Controls Report

Associate Director Sherman's declaration also provided a detailed and logical explanation for the NSA's decision to withhold the paragraph on the first page of the § 702 Controls Report.  This information, according to Sherman, "pertains to the number and categories of certifications made pursuant to Section 702 of the FAA." The NSA explains that revealing such information would reveal important details about the scope and limitation of the Agency's § 702 program which would both

15

provide insight as to the likelihood that prior communications were intercepted and as to potential manners of tailoring future communications in order to evade searches under this ongoing authority.

The New York Times challenges the adequacy of this explanation on multiple grounds.  It argues that a list of the number and categories of § 702 certifications is too inexact to pose the threat Sherman identifies, analogizing the disclosure of such information to "the FBI report[ing] on the number of wiretap applications and the types of investigations in which they were used."  (ECF No. 20 at 17.)  The NSA persuasively responds that, in fact, publicizing the fact that the FBI did not use wiretaps to investigate particular forms of crime would in fact pose a threat, and that the same logic applies to the categories of § 702 certifications at issue. Similarly, the number of targets investigated under § 702 authority, both at any one time and in trends over time, could logically and plausibly inform adversaries of the likelihood that past communications had been, and future communications would be, targeted.

Another challenge the Times advances is to the breadth of the redaction.  The Times argues that it is unlikely that the entire redacted paragraph only contains the number and category of certifications.  In the Court's view, there is little basis for this hypothesis.  The PR/TT and § 702 Controls Reports are more consistent with a good faith effort to disclose non-classified information.  Although certain sections (like the finding and recommendation discussed below) are redacted almost in their entirety, the more prevalent pattern is the redaction of particular sentences

16

and words, rather than entire paragraphs.  In light of that practice on the Agency's part, the Court does not agree that there is a credible basis to believe that the redacted paragraph contains more than Sherman indicates in his declaration.

The New York Times pursues a related argument when it suggests that there is reason to suspect that the redacted paragraph contains the NSA's legal analysis of § 702, and as such constitutes "working law."  See Caplan v. Bureau of Alcohol, Tobacco & Firearms, 587 F.2d 544, 548 (2d Cir. 1978).  Setting aside the fact that working law doctrine is a limitation on FOIA Exemption 5, which is not at issue, see Brennan Ctr. v. Dep't of Justice, 697 F.3d 184, 195 (2d Cir. 2012), there is simply no basis to believe that the redacted paragraph contains such information.  The Sherman declaration does not mention legal analysis, and the NSA clarified in a sur-reply that "the withheld information is not legal analysis."  (ECF No. 28 at 1.)  Moreover, the context of the redaction is consistent with the redaction covering only the number and categories of certifications.  The line immediately before the redaction, "FAA §702 Certifications:" ends with a colon.  So too does the paragraph that follows the redaction, and that colon is followed by a bulleted list of categories of content found in the certifications.  The context of the redaction is thus more consistent with the NSA's description of the redacted paragraph, which could naturally follow the phrase "FAA §702 Certifications:" than with the Times' description, which would not as naturally fit.

As a result of the above, the Court concludes that the NSA's explanation for its continued redaction of a paragraph on page one of the § 702 Controls Report is

logical, plausible, and contains the requisite reasonable detail to carry the Agency's burden of proving the applicability of FOIA Exemption 1.

      C.    <u>The Second Redaction in the § 702 Controls Report</u>

With regard to the final challenged redaction, on page 20 of the § 702 Controls Report, Associate Director Sherman's declaration presents an explanation for the Agency's view that the information is currently and properly classified Top Secret.  According to Sherman, the redacted information in Recommendation 3 consists of technical aspects and procedures of NSA's collections under § 702.  The declaration further states that the redacted information contains "granular detail" which, if disclosed, would publicize the sophistication of the NSA's efforts and aid adversaries' efforts to evade collection.

The New York Times argues that the proffered explanation for the redaction is inadequate in light of two related facts: first, that the redacted recommendation is one of eleven, all the others of which have been at least partially, if not entirely, disclosed; and second, that the challenged redaction is effectively total, rather than segregating out some limited information which could be disclosed.  In the Times' view, the Sherman declarations explanations relating to Recommendation 3 were too vague and conclusory and failed to address the questions raised by these observations of the redaction's context.

As the Times recognizes, the same facts can be subject to competing interpretations.  The redaction of only one of eleven recommendations could be evidence of a judicious application or redactions or could raise questions as to why

18

the eleventh was so much more dangerous to disclose than the other ten.
Sherman's declaration offers an answer: only this recommendation contains
granular technical details about improving collection procedures and methods.
That explanation is entitled to a presumption of good faith, and the Times does not
proffer any evidence that contradicts it.

The explanation that Recommendation 3 is categorically different from the
other ten recommendations in the § 702 Controls Report is also bolstered by the
redactions to Finding 2, which Recommendation 3 addresses.  As is the case for the
other ten recommendations, a majority of each of the other five findings is disclosed.
As is the case for Recommendation 3, Finding 2 is almost entirely redacted.
Redaction of both the problem and the attempt to fix it is consistent with Sherman's
statement that Recommendation 3 concerns technical aspects and procedures that
would provide insight into the NSA's capabilities and limitations.

As a result of the above, the Court concludes that the NSA's explanation for
its continued redaction of Recommendation 3 on page 20 of the § 702 Controls
Report is logical, plausible, and contains the requisite reasonable detail to carry the
Agency's burden of proving the applicability of FOIA Exemption 1.

D.   <u>In Camera Review</u>

Finally, the New York Times argues that rather than granting summary
judgment to the NSA on the basis of the Sherman declaration and the non-redacted
portions of the two reports, the Court should conduct an <u>in camera</u> review of the full
reports.  FOIA provides courts with the option to conduct such review.  5 U.S.C. §

552(a)(4)(B).  In 1974 Congress amended FOIA and, among other things, "specifically extended the language of FOIA's provision for <u>in camera</u> inspection to encompass Exemption 1."  <u>Halpern v. FBI</u>, 181 F.3d 279, 291 (2d Cir. 1999).

In this Circuit, if a supporting affidavit or declaration submitted by an agency to explain withheld information is sufficiently specific, logical, and plausible, "the district court should be able to rule on the appropriateness of the redactions without conducting an <u>in camera</u> review of the redacted materials."  <u>Id.</u> at 287; <u>see also</u> <u>Local 3, Int'l Brotherhood of Elec. Workers v. NLRB</u>, 845 F.2d 1177, 1180 (2d Cir. 1988) ("<u>In camera</u> review is considered the exception, not the rule.").  The Second Circuit's admonition that, absent an affirmative reason to doubt the government's affidavit, "the district court should restrain its discretion to order <u>in camera</u> review," <u>Halpern</u>, 181 F.3d at 292, is consistent with the oft-stated policy that it is "unwise to undertake searching judicial review" of executive explanations of national security risks and harms.  <u>Wilner v. NSA</u>, 592 F.3d 60, 76 (2d Cir. 2009) (quoting <u>Ctr. for Nat'l Sec. Studies v. Dep't of Justice</u>, 331 F.3d 918, 927 (D.C. Cir. 2003)).

In this case, there is no evidence that contradicts Associate Director Sherman's declaration.  Nor does the declaration confine itself to boilerplate recitations of the statutory requirements; instead, it is quite detailed.  There is also no evidence from which one could infer bad faith on the part of the Agency; to the contrary, the Agency has turned over documents which have led to published stories, have turned over supplemental documents following discussions with the

Times after the initial disclosures, and is not even alleged to have conducted an inadequate search for records.

The Sherman declaration articulated a reasonably detailed explanation for the redactions which was both logical and plausible.  It did so in a way that served its functional purpose by permitting the New York Times to meaningfully, and fairly specifically, challenge the proffered explanations.  As the Times put it in its briefing, "the court's task in cases involving national security is to consider both whether the affidavits are sufficiently detailed and whether the explanation offered for any given redaction is 'logical and plausible.'"  (ECF No. 20 at 11.)  Under the facts of this case, that task can be, and properly is, carried out without <u>in camera</u> review of classified materials.

IV.    CONCLUSION

For the reasons stated above, the National Security Agency's motion for summary judgment is GRANTED and the New York Times Company and Charlie Savage's motion for summary judgment is DENIED.  The Clerk of Court is directed to close the motions at docket numbers 15 and 19 and to terminate this matter.

SO ORDERED.

Dated:      New York, New York
            August 25, 2016


_____
        KATHERINE B. FORREST
        United States District Judge

21